Case number 23-3969, Fair Housing Ctr of Metropolitan Detroit v. Singh Senior Living LLC et al. Oral argument, 15 minutes per side. Mr. Hommel for the appellant. Good morning, Your Honor. Before I proceed, may I confirm that I've reserved five minutes for rebuttal? Thank you. Thank you very much. Good morning, Your Honors, and may it please the Court. In the fair housing space, the reasonableness of an accommodation is a fact-intensive enterprise. And here, the quickest pathway to resolve this appeal comes from the steering in the third and final tests. Specifically, in July 2020, a tester contacted the Royal Oak facility on behalf of someone who is deaf, cannot lip-read, and cannot read and write English. Was that someone identified in the record? By someone, Your Honor, you're referring to the tester or the relative? You said a someone that the tester was contacting the center about. Who was the someone? Yes, the someone. So for the third test, which blends into the second test, there were employees at Royal Oak named Michelle and Shelly. My understanding is that they're two distinct individuals. Those are the testers or the clients? Those were the employees of Royal Oak. And the tester is in the record as well. Okay. Well, who was the actual disabled person that the tester was calling on behalf of? The tester was calling on behalf of a deaf relative, a fictitional hypothetical deaf relative. Okay, so there was no actual person that was being called on behalf of? That's correct. So why does your client have standing, given that there's no actual individual who was seeking housing? Your Honor, my client has standing under Havens and the case law that followed. Specifically, Havens, of course, looked at organizational standing, diversion of resources, and frustration of mission. Here, the diversion, both in terms of the outreach that was conducted afterward, social media, advertisement, and article about deaf residents' rights to reasonable accommodations, as well as other pre-litigation costs that were expended. And the frustration of mission also involves impeding the fair housing work, which the Fair Housing Center does. And in addition, as we put in our Rule 28J letter, the Fair Housing Center here also does counseling and referral services. Are there any particular individuals that were being counseled or referred to that were seeking housing at these defendant institutions? Not in the record, Your Honor. My understanding, based on Havens and even the Supreme Court's discussion in FDA versus Hippocratic Alliance for Medicine, is the language used in the latter case was perceptibly impaired, and this is impaired. By giving information that they don't provide ASL interpreter services, period, that would force the Fair Housing Center, when counseling individuals, when speaking to organizations, to provide incorrect information. Are you making the contention that the defendants made any false statements to the testers? Yes, Your Honor. What were they? The fact that ASL interpreter services are outside their scope. So you believe that they were, in fact, inside their scope? Yes, Your Honor. What do you mean by inside their scope? Sure, Your Honor. So I'm quoting from the testing narrative itself. So the individual, I believe it was Michelle for that third and final test, said, ASL interpreters is, quote, outside our scope. Essentially that they were categorically being denied. And I think that's an important point. I'm sorry what you mean by that. Are you saying that she's taking the position that they do not have ASL interpreters at the facility? Is that what she meant by out of scope? It would be both whether she meant ASL interpreter services on staff or ASL interpreter services that they would hire from a third-party vendor because there was no statement. Are you saying that they did have ASL interpreters and that's the falsity? No, the fact that they have the ability to procure them. Just because they don't have them on staff, they have the financial resources. So the fact that she said she does not have the ability to procure them, that that's a false statement. That's right. By saying it's outside of their scope, the Royal Oak facility has an affirmative obligation to provide reasonable accommodations. And it's important because in saying that it's outside our scope, to be clear... Is this the first time you're raising, and I don't begrudge you for doing so, but is this the first time you're raising this falsity theory in response to Alliance for Hippocratic Medicine? Yes, in the sense that we're explicitly stating falsity, but I think baked in the record and the complaint and what the allegations were and what discovery borne out is because in saying it's outside of their scope and we had deposition tests... So we can talk about that, but can we talk about the... It seems to me that the main theory for standing that our case law authorized, setting aside the falsity or the information injury, has been absolutely... Well, I shouldn't say absolutely because I'm actually still debating it, but it's absolutely called into question, I will say, by Alliance for Hippocratic Medicine. There the claim was that the medical organizations, and I'm looking just at a paragraph of the court's opinion, they claim to have standing not based on their mere disagreement with FDA's policies, but based on their incurring costs to oppose FDA's actions. So I think what the court had in mind was if you disagree with somebody about something, if you incur costs to challenge them, that is not itself going to be enough to create standing. Now, I understand our case is to have said the opposite, that when you are investigating somebody because you think they have violated the law, you are incurring costs to oppose their actions, and that is enough for standing. I just don't see how that theory survives Alliance for Hippocratic Medicine. That theory survives because I think the core distinction, and this goes a little bit to the NAACP versus Lee case that I know you and Judge Bush were on, is I think with Havens, the Supreme Court and FDA called it an unusual case. I don't know specifically in what sense, but what I will say is that Havens is a fair housing case. It wasn't just a mere disagreement with what Royal Oak is doing. I think in addition to that. But they incurred costs, and that was Alliance for the medical organizations. It wasn't mere disagreement. They incurred costs opposing the actions by filing a petition for review, by engaging in studies to disprove what the FDA was saying. So it was incurring real costs like I assume your costs here would be the tester time and the tester calling, right? I assume that that was your theory of Article III injury at one point. It was the costs involved with the testers? It was part of it, certainly, Your Honor. In the district court's decision in upholding standing discussed the costs that were incurred in addition. Why aren't those costs analogous to the costs that the court found insufficient? Because it wasn't just we oppose FDA, therefore we have standing. It was we have taken concrete actions to oppose, and those actions have cost us money. I think the distinction is that the Fair Housing Center here has a statutory mandate and a regulatory requirement to investigate and to conduct enforcement. But Congress can't create standing. Well, but it's going toward what Congress is saying, that in receiving the HUD grants, they have an obligation to conduct investigations, not only just from past complaints, but to understand if individuals and facilities are complying with the law. Let me make sure I understand the HUD grant here. It actually says that they have to do it as a tester without any particular clients. Is that the condition of the HUD grant? I don't know the precise grant itself, but I know that from 42 U.S.C. section 3616A, subsection B to A through E, it discusses that HUD enters into, quote, contracts with private fair housing enforcement organizations, close quote, to, open quote, carry out testing and other investigative activities, close quote. In addition, open quote, provide funds for the costs and expenses of litigation, close quote. So they're not really providing the funds for counseling of actual people. The funds are actually going just for this hypothetical testing. Isn't that the way to read that grant, or am I missing something? Well, whether the funds are going specifically for enforcement of prospective discrimination or the counseling and referral services, I think this goes back to Havens in discussing that. If there's a defendant entity that's interfering or impeding or negating a fair housing organization's responsibility to ensure fair housing, that ensures standing. And another point, Judge Bush, coming back to it before, although that there's nothing in the record that the Fair Housing Center spoke to individuals about counseling and referral services, it also does consulting work, and it did meet with a deaf organization known as DeafCan, speaking about different circumstances here. Can I switch back to the merits? I was curious, do you know of any other case where a Fair Housing Act claim has been predicated on a fictitional handicapped person? Yes. So in the district court's decision as well as in the party's briefs, we've discussed the Southwest series of cases. For example, those are three cases in the District of Arizona. The facilities were called Chandler, Campana, and Scottsdale. So in two of the three, Scottsdale and Campana, the district court found that there was genuine issues of material fact to send it to a fact finder. And in those cases, the facts were not as strong as they are here. In Scottsdale, for example, the tester said, I'm able to communicate with my deaf relative through English. What I'm struggling with, so I'll look at those cases. I appreciate that. So I read the text, and it says, to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling because of a handicap of that person or any person associated with that person. I take it, in order to state a claim, it seems to me I could read this text and think that person doesn't mean dog, cow, ghost, or fictitional person. It actually means a real person. What would be wrong with that reading? And so you've alleged discrimination against a fictitional person, but why wouldn't we read it to mean real person? Your Honor, I would have two responses, and for full disclosure, I see my time's up, and I want to lift it. So for the real versus fictitional, I think because the Fair Housing Organization is associated with helping individuals find housing, whether it's consulting or referring services, they're associated with those individuals. And I would say, second, just going back to this Court's binding precedent looking at Fair Housing Organizations, I don't think that the FDA case changed this Court's precedent in that sense. For example, in the NAACP case, in the Pecuriam decision, this Court noted two developments post-Havens. The FDA case, and I think that goes back to what we were discussing before, is that not just any organization could claim an injury and divert resources. Second, this Court also stated that even since Havens, the Supreme Court's pleading standards have changed. Even this Court had dismissed cases at the summary judgment stage because of an insufficiency of evidence. I don't think because FDA questioned the viability of Havens, and I don't think that changes this Court's precedent in the cases that were discussed in the District Court's decision, including old St. Andrews and the Online Merchants Guild case, in terms of the diversion of resources and the frustration of mission would give standing to a Fair Housing Organization here. Thank you, Your Honors, and I'll come back on rebuttal. Thank you. Good morning, Your Honors. Andrew Keating on behalf of Defendants Appellees, Sings Senior Living et al. Judge Murphy was absolutely correct that under Alliance for Hippocratic Medicine, FHC does not have standing. And the reason for that is because in Alliance for Hippocratic Medicine, the Supreme Court said that a plaintiff cannot spend its way into standing by simply gathering information and advocating against the defendant's activities. But that was the specific basis of the District Court's ruling. The District Court held that FHC had standing in this case because it engaged in testing, that is, gathering information about Waltonwood, and advocating against Waltonwood's activities through subsequent social media posts and advertising and publishing articles in newspapers. But I'm struggling with how to read Alliance for Hippocratic Medicine. It didn't overrule Havens, so it certainly limited it, called it an unusual case. And it seemed to suggest that the false information, the fact that the apartment complex said there were no rooms available to the African-American testers when, in fact, there were, and your friend on the other side has come back with the 28-J letter and suggested there was false information here that was provided. Why isn't that enough to make it the unusual case just like Havens? Well, Your Honor, I agree that Alliance for Hippocratic Medicine is, it does something interesting with Havens, I guess I would put it. But basically, in Alliance for Hippocratic Medicine, the Supreme Court construes Havens as having two requirements for a testing organization specifically. One, the organization receives false information, and two, the receipt of the false information causes the organization's organizational mission to be impaired somehow. But that comes with the caveat, as expressed in Alliance for Hippocratic Medicine, that just gathering information and spending money on advocacy don't give a plaintiff Article III standing. So the reason that FHC does not have standing here, in addition to the fact that in the district court its claim is exclusively based on advocacy and publishing and outreach and investigation, is that FHC's counseling services are not the same kind of counseling services as described in Havens. In Havens, there is more of a housing placement type service. I was struggling with that type of analysis of Alliance. Isn't Alliance clear that it is not overruling Havens? Right? I agree 100%. And isn't the key to that that its careful, its limitation was careful not to extend the Havens holding beyond its context? Right? I agree. And wasn't Havens spot on with this case? It's not because, as the court highlighted in Alliance for Independent or Alliance for Hippocratic Medicine, again, Havens had this additional aspect where receiving the false information impaired its ability to place people in housing. The organization, Havens, had this specific thing where it put people in housing, and it couldn't do that because it received incorrect information. FHC's counseling services, if you look at the record, including specifically the annual reports put out to donors at ECF 31-3 in the district court record, make clear that FHC's counseling is legal services. It's not putting people in houses. It's responding to specific. Wasn't this the same in that this organization was providing assistance to individuals pursuing legal rights and remedies related to fair housing, offering housing assistance and counseling, and providing community outreach education and fair housing training, that they might have had some moderate distinction in how those two, Havens and I usually refer to it as Center, just to make it easier to remember, that they all develop those types of goals somewhat differently. How can that take this case outside the context of Havens? Because there was a specific aspect of Havens' organizational mission, placing people in housing, that it could not do if it didn't have correct information about the nature of the housing that it was placing people into. In other words, in Havens, the organization, I think it was called Homes, it wants to know whether there's vacancies in apartments or not, and if it's receiving false information about that, it can't do that anymore. Well, isn't that the very same thing here? Because if a tester goes, as they did here, and they say, we need this type of accommodation because deaf from birth, unable to lip read, the whole list that was specifically provided in the July test, and the first of all, the organizations did not respond. The testers had to call back. But when the testers called back, what they were ultimately told was, that's outside our scope. You may go hire somebody, or let's divert you to another facility to take care of that. Isn't that a statement that we do not reasonably accommodate individuals who require American Sign Language? And so there can't be a spot there because the employee said, outside our scope, we don't do that. Isn't that very comparable to Havens? Well, the key distinction, Your Honor, is that FHC services, when it provides counseling, are legal services. So a tenant comes into FHC, and you can see this again from the annual reports in the record at 31-3, where it extensively describes its activities. Individual people come in and say, I'm having this problem with my landlord, or I have this land contract issue. These are issues that people are coming in for related to housing, but none of it is actually traceable to anything that Walton Wood did here. Or isn't it traceable to something that Walton Wood refused to do? Well, there's no evidence that any of the, and this kind of goes back to Judge Bush's question about the actual person, there's no evidence that anybody that FHC actually helped in this case was discriminated against by Walton Wood. So your position is that testers on HUD grants that authorize them to go out into the community and determine what facilities and opportunities are available must have a person standing behind them that they are representing as opposed to being what the name indicates, simply testers of how the facilities operate. Well, I would agree that under Havens, as understood by Alliance for Hippocratic Medicine, it isn't enough to just have basically a testing organization call people and there's no actual individual behind the test. So your legal position is that testing organizations pursuant to HUD grants may only operate when they have a named individual with that disability and seeking that service. What is your, what case law do you have that supports that type of requirement? So I wouldn't say that that's my position. What I would say my position is is consistent with Havens as read by the Supreme Court in Alliance for Hippocratic Medicine. The testing organization still would have standing if they got bad information from a test and then that impaired their ability to do some other activity. And FHC doesn't do anything for which receiving bad information from Walton Wood would cause it to be unable to carry out its mission. I'm still, that's the same answer. That your mission, you may go test and once you find out they don't do that, you have to go out and find somebody who has that problem and then you have to say I've got somebody here so now I have standing because they're standing behind me. I don't understand that there's any law, I have not seen any cases on testing organizations that would suggest that you can't, that organization can't perform a test and try to determine what the answer would be from the organization, which here was we don't do that. That is not within our scope. We don't provide that. You may go pay for it or you may go to another facility. How is that not a refusal to provide care within the scope of reasonable accommodations to deaf individuals? So there's sort of a standing question that I'm inferring there but also a merits question and I'll answer both. As to the standing, the way that FHC would have standing in this case is if it did something similar to the plaintiff organization in the Havens case that it would be less effectively able to do if it received bad information. However, the counseling that FHC provides in this case is based on individual complaints and there's no evidence that individuals have been discriminated against by Wollenwoods. Once again, we're back to your requirement that they must have an individual who has been denied that opportunity in order to have standing to bring a client. Well, that's one way to standing. The other way is, and this would be consistent with how the Supreme Court has recently interpreted Havens, is if FHC had an aspect of its organization where it actually referred people into housing and that aspect of its organization required it to know which housing facilities have availability, then FHC would have standing because receiving the bad information would have interfered with its organizational mission. So it's not enough that its organizational mission is to test to find out what's available and it's not enough to then be told, we don't do that. We won't provide it. If you want it, you have to pay for it or you have to go somewhere else. You're telling me that we have to look through all of that. We can't look just at the statement of the center's purposes and intentions and work that they do. They have to, in fact, bring somebody to court who has been refused that service. That is just, to me, antithetical to the entire idea of a HUD grant to have someone in the field examining where services are provided or not provided because my struggle is that the purpose, as I understand it, of these HUD grants is so that individuals don't wind up going to these facilities and simply being told, we don't do that. Go somewhere else. The goal of the testers is to understand what is provided so that the denied person knows what is available. Otherwise, the denied person says, gosh, we've got to put mom somewhere else. I don't know where to go with her. We'll go down the street where they sent us. Doesn't that undercut the goal of having a testing entity at all? My response is that if a testing entity just tests, that would not be enough to establish standing, and the reason for that is because in the Supreme Court's recent decision in the Alliance for Hippocratic Medicine, it says that gathering information alone is not sufficient to confer standing. That's an FDA case. This is what the Supreme Court said was, we're not going to overrule. We're not going to overrule Havens. We're going to leave Havens. It's an unusual case and an unusual context. And what is that unusual case and unusual context? It's Fair Housing. It's the very requirements of this case. I struggle with having to show the court that you can win in the end in order to be able to get your foot in the door with standing. I'll put another wrinkle on it, though. The Havens case was a race discrimination case, wasn't it? Yes, sir. Here we have a disability discrimination. Looking at the definitions of the types of ways to accommodate hearing disabled persons, it strikes me the definitions, at least in the regs, seem to indicate you need to be able to evaluate the particular person that is being discriminated against, whereas in a race situation, you don't really need to know anything about the person other than their race. Whereas for a disabled person, don't you have to have more of an individualized assessment to determine what the reasonable accommodation is for hearing at least? I mean it seems like there are different alternatives here besides interpreters. Am I missing something here? Because that strikes me that you do need to know who the individual is in order to determine not only standing but also the merits. Judge Bush, I'd love to answer your question. I see your time is up. May I answer the question? Yes. I think this goes to the district court's decision on the merits completely. Your Honor is absolutely correct. The necessity of an ASL interpreter or a lot of other accommodations is really context dependent, and the regulations from the ADA that we cite in our brief and which the district court cited below make that point really clearly because unless we know what a person is going to do with the accommodation and what the person's individual needs and abilities are, it is basically impossible to determine what accommodation is going to work for this person and what will not. Of course, and isn't that the merits question? That is the merits question. Yes, Your Honor. What we're talking about is the standing question. Well, as to standing, I believe I've communicated my point, which is that in Havens there was an aspect of the organization which involved placing people in housing, which nothing cited in the 26J letter yesterday, none of the citations pointed to anything showing that FHC actually places people in housing or does anything that would be specifically affected by the answers given to the tests in the test list. Thank you. Thank you, Your Honors. May I proceed? Your Honor, the first point I would like to emphasize is that, yes, the work of a fair housing center is to be proactive, to make sure that individuals in the future are not discriminated against and are not subject to dehumanizing and lowering behavior. Going back to FDA, the Supreme Court did not overrule Havens, did not question the viability, and this case is cut from the same cloth. It's a fair housing case. There was steering, racial, in Havens, disability-based in this case. Don't you think there's a difference between race discrimination and disability hearing discrimination in terms of needing to know who the individual is? No, Your Honor, because I think that goes more to merits, and I would say that we do have information. I mean, of course, the person who has the disability was fictitious, but it's not as if the tester said, I don't have any information. But is it reasonable to assess the liability of a defendant based upon a hypothetical given over the telephone as opposed to actually seeing the person in the flesh? Yes, it is for two reasons. One, there's no case law as far as I'm aware, Your Honors, that there must be a flesh-and-blood person and not a tester. But second and more importantly, the response here was a categorical denial. There was no suggestion if we had more information, we can consider it. We don't have the financial means. Weren't there some of these responses? I took the impression that they were wanting the person to come in, I mean, to talk to them, or at least not literally not talk to them, but to at least see who they are. That's the impression I got from some of these responses. Yes, Your Honor, the important point is that there were the three tests per facility, three for Lakeside, three for Royal Oak with a few follow-ups. I think what's important is that the work of Fair Housing is to make sure that they have the right answer. So there's a natural progression with the test to understand what the facility's response is. So in the beginning there were some different responses, but the final response, when you're confronted with someone with only expressibilities in American Sign Language, it was a categorical denial. They steered them to two separate facilities. They said, this is outside our scope, there's this place called A Place for Moms, I would love if you could go there. And they suggested a second place called Ambrosia Villa. There was no invitation to provide more information or to discuss what context do you need this, how long do you need this, things of that nature. So they had enough information, but certainly, Judge Bush, on the merits, a fact finder may agree with me or disagree and say, based on the information this was not a necessary accommodation or may agree with me. That's why on the merits it's a fact-intensive inquiry for a fact finder. I had one final question on standing that I wanted to give you a chance to opine on. So Havens expressly said it was only about damages, and it had a representational standing type claim for an injunction, but that had settled. I take it you had both claims here, damages and you were seeking an injunction? We do, but squarely on the appeal and district court decision, only the damages remedy was expressly discussed. Okay. So are you disavowing your injunction request then, so we only have to consider the damages? We wouldn't disavow. I would say that obviously there's the additional threat of a recurring harm, and I would say based on what we've ferreted out in discovery and confirmed, that especially with this discussion still about what information would be required, to us it comes across as post hoc discussion of a justification. So I think there's a threat of recurring harm if there's no clear indication they provide services. That's what I was going to ask about. So you think you would have to show, because the court has said there's no standing in gross, you have to consider the type of claim, past injury for damages, future injury for. . . So your future injury would be continued monitoring? Is that the theory? It would be both. . . I would say effectively the same injury, but extended out. So diversion of resources, that could cost money monitoring. Second, frustration of mission if there's the continued impeding of providing fair housing or creating roadblocks to decide what a deaf individual needs. And third, in terms of, let's say, for example, referring services out. If they were to discuss, for example, the DEFCON organization to say, we're not sure if they would provide services, there has to be a clear delineation of what the requirement is, things of that. I mean, certainly we would place all chips in on the damages remedy, as we've discussed in the papers, in the Rule 28J letter. And Judge Bush, going back to the DEFCON, just for the record purposes, in our opposition brief below, that's Record Entry 32, it's Page ID 507 to 508, that collects the sources. And Judge Murphy, going back to your question about Southwest, specifically in our opening brief on Pages 18 to 20, is the citations for Chandler and Scottsdale, both the Southwest cases. Are there no circuit cases on this yet? It seems like there's not a lot of precedent on not just testers, but the use of testers who have fictitional relatives. To be frank, Your Honor, I'm not aware of a wealth of cases. What I will say is that the Southwest cases were affirmed by the Ninth Circuit. In addition, I see my time's up, if I may briefly conclude. Thank you. The other point, Judge Murphy, building off that is, once again, we're not aware of any cases, especially in light of the HUD grant, in which there must be a flesh-and-blood person. In the statutory text, it refers to a buyer or renter. I don't think that necessarily infers that it has to be a real person. The text does say it has the list of three, and it always uses the word person. So I would say discrimination if the buyer or renter is a handicapped person or associated with a handicapped person. Obviously, this would fall within the associated with the handicapped person, I assume. And so would we not have to read the associated with the handicapped person to mean not a real person, I guess? Well, I guess in some sense, because the tester is calling on behalf of someone who theoretically could buy it, I think there's a possibility that it could fit into subsection A. But certainly the association, certainly it would fit there. But going back to your point about the cases, there is the old St. Andrews case from this court. Now, it's not as if there wasn't a flesh-and-blood person, but there was no prior complaint. So I think that does tend to suggest that it can be a fair housing organization that is doing this proactively. With that, Your Honor. In working through HUD grants, are you aware of any organization that receives a HUD grant or any discussion through HUD itself that says that there is a requirement that a testing organization must have an actual individual in order to undertake a test? No, Judge Strantz. I'm not aware of any requirement whatsoever. Okay. And because of that, given the testing organizational standing here and the categorical refusal, I think my client both has standing for the reasons discussed. In addition, given the categorical refusal, this matter should be remanded for a fact-finder to consider whether an ASL interpreter would be reasonable and necessary under the circumstances. Thank you very much. We thank you both. This is a difficult issue, and we appreciate your briefing and your argument. The case will be taken under advisement and an opinion issued in due course.